## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| In Re:  GLASSHOUSE TECHNOLOGIES, ) | |
| INC., ) | |
| ) | |
|       Debtor. ) | |
| _____ ) | |
| ) | Civil Action No. |
| ) | 22-11725-FDS |
| JONATHAN GOLDSMITH, Trustee in ) | |
| Bankruptcy for GLASSHOUSE ) | |
| TECHNOLOGIES, INC., and WF FUND ) | |
| IV LIMITED PARTNERSHIP (c/o/b as ) | |
| WELLINGTON FINANCIAL LP, ) | |
| WELLINGTON FINANCIAL FUND III, ) | |
| and WELLINGTON FINANCIAL ) | |
| FUND IV), ) | |
| ) | |
|       Plaintiff-Appellants, ) | |
| ) | |
|       v. ) | |
| ) | |
| MARSH USA INC., ) | |
| ) | |
|       Defendant-Appellee. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER ON APPEAL FROM BANKRUPTCY COURT

SAYLOR, C.J.

This is an appeal from the United States Bankruptcy Court for the District of

Massachusetts.  In June 2014, GlassHouse Technologies Inc. filed for Chapter 7 bankruptcy.  In

this action, Jonathan Goldsmith, the Chapter 7 trustee for GlassHouse, and several entities

affiliated with Wellington Financial, its senior secured creditor, have sued Marsh USA Inc.,

GlassHouse's former insurance broker.

In April 2013, GlassHouse and Marsh executed an engagement letter that addressed the terms of Marsh's provision of insurance broker services.  Among other things, the agreement required GlassHouse to provide accurate and complete information to Marsh in connection with the acquisition or renewal of insurance coverage.

By late 2013 and early 2014, GlassHouse was in serious financial difficulty arising from various tax and accounting irregularities at its British subsidiary.  At the time, the company had an insurance policy that included director and officer ("D&O") liability coverage with a $15 million limit.

The existing policy was a "claims made" policy that covered a period ending on June 1, 2014 (or earlier if there was a "change in control" of the company).  Beginning in March 2014, representatives of GlassHouse and Marsh discussed the purchase of "tail coverage," which would extend the reporting period for a claim after the policy would otherwise expire.  In late March 2014, Marsh procured quotes for obtaining that coverage with different protection levels and for different periods.  After balking at the price for D&O tail coverage that would continue the $15 million limit, on April 14, 2014, GlassHouse directed Marsh to purchase coverage with a limit of $5 million.

The trustee and Wellington contend that Marsh failed to procure adequate insurance coverage for, and provide proper advice to, GlassHouse in connection with that decision.  They also contend that Marsh improperly reduced GlassHouse's D&O coverage by $10 million, leaving the personal assets of its directors and officers vulnerable to a lawsuit.

In substance, the bankruptcy court concluded that GlassHouse had failed to inform Marsh before April 14 that its principal creditor, Wellington, was threatening to file suit against the directors and officers of GlassHouse for negligently misrepresenting the financial status of the

2

company.  Because it failed to do so, Marsh assisted in the placement of the tail coverage without being made aware of an imminent and substantial threat of potential liability from a specific source.  The bankruptcy court concluded that GlassHouse's failure to disclose that threat to Marsh—which likely affected not only the scope and price of the tail coverage, but whether it even could have been procured—was a material breach of contract that relieved Marsh of its obligations under the engagement letter.

The bankruptcy court dismissed several of the claims, and then entered summary judgment for Marsh on those that remained.  The trustee and Wellington have now appealed to this court pursuant to 28 U.S.C. § 158(a)(1).  They contend the bankruptcy court erred in entering summary judgment for Marsh on the trustee's claims for breach of contract and negligence and in dismissing Wellington's claim for negligence.

For the reasons below, the judgment of the bankruptcy court will be affirmed.

## I.    Background

### A.    Factual Background

The following facts are drawn from the bankruptcy court's decision and the record evidence.  Except where otherwise noted, the facts are undisputed.

#### 1.    The Parties

GlassHouse Technologies Inc. is a corporation that provided information technology, infrastructure consulting, and managed services.  (Appellants' App. 5, 2).

Marsh USA Inc. is an insurance broker.  (*Id.*).

WF Fund IV Limited Partnership (c/o/b as Wellington Financial LP, Wellington Financial Fund III, and Wellington Financial Fund IV) ("Wellington Financial") was a creditor of GlassHouse.  (*Id.*).  At the time of the filing of the bankruptcy petition, it was the only senior secured lender of GlassHouse.  (*Id.*).

2.      **The Engagement of Marsh**

In 2012, GlassHouse retained Marsh as its insurance broker to provide services in connection with insurance coverage, including D&O coverage.  (Appellants' App. 1, 23; Appellants' App. 4, 291-93 (Oct. 5, 2020 Dep. of Jeffrey Wakely at 16-18)).  The individual at Marsh principally responsible for the GlassHouse account was Kerri Petri, with assistance from Shawn Donaher.  (Appellants' App. 4, 222 (Oct. 1, 2020 Dep. of Kerri Petri at 31)).  Marsh's primary contacts at GlassHouse were Jeffrey Wakely, its chief financial officer, and Mark Chiplock, its vice president of finance.  (Appellants' App. 4, 368-69 (Sept. 23, 2020 Dep. of Jeffrey Wakely at 49-50)).

Although the record is unclear, it appears that a D&O policy was first issued by an affiliate of AIG, an insurer, in 2012.  The D&O coverage limit was $15 million.

The D&O policy became due for renewal the following year.  On April 24, 2013, GlassHouse and Marsh executed an engagement letter in connection with that renewal.  (Appellants' App. 1, 23).  Among other things, the engagement letter provided that Marsh would assist GlassHouse in assessing its risks, recommend insurance specifications, and solicit, recommend, and place insurance coverage.  (*Id.* at 24).

The engagement letter provided in paragraph 5 as follows:

> You shall be solely responsible for the accuracy and completeness of all information that you furnish to Marsh and/or insurers, and you shall sign any required application for insurance.  Marsh shall not be responsible to verify the accuracy or completeness of any information that you provide, and Marsh shall be entitled to rely on that information.  Marsh shall have no liability for any errors, deficiencies or omissions in any Services provided to you, including the placement of insurance on your behalf, that are based on inaccurate or incomplete information provided to Marsh.  You understand that the failure to provide all necessary information to an insurer, whether intentional or by error, could result in the impairment or voiding of coverage.  You will review all policy documents provided to you by Marsh.

(*Id.* at 25).  The letter further provided in paragraph 7:

4

> In no event shall either party to this Agreement be liable for any indirect, special, incidental, consequential or punitive damages or for any lost profits arising out of or relating to any services provided by Marsh or its affiliates.

(*Id.*).

### 3.   The D&O Policy

With Marsh's assistance, the policy was renewed in 2013 from June 1, 2013, through June 1, 2014.  (Appellants' App. 1, 53-58 (Nat'l Union Fire Ins. Co. Pittsburgh Policy for GlassHouse)).  The coverage limit was again $15 million.  (*Id.* at 56).

The policy covered, among other things, losses incurred by directors and officers arising out of "wrongful acts" committed in the course of their employment, including any "breach of duty, neglect, error, misstatement, misleading statement, omission, or act" by the employee.  (*Id.* at 72-73).

As a claims-made policy, GlassHouse would only receive coverage for claims reported within the policy period.  (*Id.* at 53, 68).  However, the policy allowed GlassHouse to preserve certain coverage without identifying a specific claim, on the condition that it gave notice of a potential claim.  Specifically, it provided:

> If during the Policy Period or during the Discovery Period (if applicable) the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributed to such circumstances or alleging any Wrongful Act which is the same as or is a Related Wrongful Act to that alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

(*Id.* at 63).  Such a written notice is commonly referred to as a "notice of circumstances."

The policy also contained a "change in control" provision, which would end coverage for any claims arising after any sale or merger of the insured company.  It read:

> If during the Policy Period: (a) The Named Entity shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or (b) Any person or entity or group of persons or entities acting in concert shall acquire Management Control of the Named Entity; (either of the above events herein referred to as the "Transaction"), then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction.

(*Id.* at 65).

GlassHouse also had the right under the renewed policy to purchase "tail coverage," which would extend the reporting period for a claim after the primary policy had expired.  (*Id.* at 64-65).

### 4.    The Tax Liabilities

In 2009, GlassHouse UK, a British subsidiary of GlassHouse, owed a liability to HM Revenue & Customs ("HMRC"), the taxing authority of the United Kingdom, arising from unremitted paycheck withholdings (known as "PAYE," or "Pay As You Earn," withholdings). (Appellants' App. 4, 1-7 (Sept. 3, 2020 Dep. of Mark Chiplock at 15-22; Sept. Wakely Dep. 11-14)).

In 2010 and 2011, GlassHouse UK defaulted on its own PAYE withholding obligations. (Chiplock Dep. 15-20; Sept. Wakely Dep. 11-15).

On October 11, 2013, the GlassHouse board of directors and Wellington were informed that the tax arrears had not been resolved; that GlassHouse UK continued to default on its tax obligations; and that HMRC was seeking a wind-up of GlassHouse UK.  (Appellants' App. 3, 116-22 ("BOD Update slides"); Appellants' App. 4, 1-3 (Sept. 3, 2020 Dep. of Stephen Sharp at 30-33)).

According to GlassHouse, as of October 2013, it still had sufficient assets and cash flow to repay its creditors.  (Sharp Dep. 41, 44-47).

The board of directors of GlassHouse decided to put the entire company up for sale and retained an investment bank, TM Capital, to assist with the transaction.  (*Id.* at 45-45).  With assistance from Wellington, the PAYE obligation was paid.  (*Id.* at 39-40, 44-45).

At some point in late 2013, GlassHouse personnel learned that GlassHouse UK personnel had also overstated its revenues.  (Chiplock Dep. 34-36; Sept. Wakely Dep. 58-59).  In addition, GlassHouse UK owed further arrears to HMRC for unremitted value-added tax ("VAT") withholdings that it had collected from its customers.  (Chiplock Dep. 36-37, 39-40; Sept. Wakely Dep. 62-63).  On February 26, 2014, HMRC served a new wind-up notice for GlassHouse UK.  (Chiplock Dep. 41-42; Appellants' App. 3, 158-66).  At some point, GlassHouse UK was placed into receivership by British tax authorities.

According to GlassHouse, before the February 2014 wind-up notice, TM Capital had obtained indications and letters of intent from potential purchasers for up to $12 million. (Chiplock Dep. 63-64; Sept. Wakely Dep. 67-68; Sharp Dep. 51, 56-57, 62-63; Appellants' App. 3, 175-76).

Because of the new wind-up notice, the potential purchasers withdrew, and GlassHouse could not be sold as a going concern.  (Sharp Dep. 57-58).  Instead, certain assets and subsidiaries were sold piecemeal in a series of sales between February 27 and June 16, 2014; no single party purchased all of the assets.  (Appellants' App. 5, 119 (Feb. 21, 2021 Decl. of Mark McQueen)).

### 5.    The Purchase of Tail Coverage

By February 27, 2014, Mark Chiplock at GlassHouse had informed Shawn Donaher and Kerri Petri at Marsh about the accounting and tax irregularities at GlassHouse UK.  (Appellants' App. 4, 89 (Sept. 30, 2020 Dep. of Shawn E. Donaher at 40-45); Appellants' App. 167-69).  That

day, Chiplock sent them the wind-up notice from HMRC arising out of the failure to remit VAT collections.  (Appellants' App. 170-71, 264).

On March 3, 2014, Shawn Donaher e-mailed three other Marsh employees, Machua Millett, Bethany Greenwood, and Kerri Petri, about GlassHouse's situation.  (Appellants' App. 3, 272-73).  He told them about "a unique potential claim situation" arising because "GlassHouse is now insolvent in the UK and . . . owes GBP 616,000 to the UK government [in] various back taxes."  (*Id.*).  He told them that after a telephone conversation GlassHouse's counsel, "the executive team is worried this sum might follow officers' personal assets [if] the US parent cannot pay the sum owed/ goes insolvent."  (*Id.*).

On March 24, 2014, Craig Netterfield, on behalf of Wellington, sent Wakely, GlassHouse's CFO, an e-mail seeking information about GlassHouse's existing D&O coverage and asked whether GlassHouse would be purchasing tail coverage.  (Appellants' App. 3, 123-24).  As noted, the existing policy provided that GlassHouse could purchase such coverage.  Wakely responded that he believed that GlassHouse would do so.  (*Id.* at 123).

On March 28, 2014, a conference call took place between GlassHouse, represented by Wakely and Chiplock; Marsh, represented by Petri and Donaher; and two underwriters from AIG, the insurer.  (Appellants' App. 4, 134-35 (Oct. 27, 2020 Dep. of Steve Maggiacomo at 24-25); Chiplock Dep. 29-30).  According to Marsh, the purpose of the call was to discuss the possible purchase of tail coverage.  Wakely and Chiplock advised AIG and Marsh that tail coverage was necessary because GlassHouse UK had failed to remit taxes and that HMRC had instituted a wind-up against the subsidiary, which had been placed into receivership.  (Chiplock Dep. 126-27).  They also told them that the company had "unpaid vendors . . . and creditors, as well as a senior lender that was unhappy."  (*Id.*).

On the same day, Petri sent herself an e-mail with notes from the call.  (Appellants' App. 3, 174).  Her notes indicate that Wakely and Chiplock advised AIG that GlassHouse's assets were being sold.  (*Id.*).[1]  Her notes also show that Wakely and Chiplock advised AIG that Wellington was GlassHouse's senior secured debt holder and that GlassHouse had been "forced" into its present position (presumably, having to sell its assets) "given the Wellington situation" (presumably, because the loan was in default).  (*Id.*).  Under the heading, "What will be left of [G]lass[H]ouse after [the asset sales]?" she noted, "Any sense today of creditor water fall"; under that, she wrote, "Wellington $13M – all go to them."  (*Id.*).

Petri's notes do not indicate that the parties discussed any possible claims by Wellington against the directors and officers of GlassHouse.  (*Id.*).

Shortly after the March 28 call, Marsh obtained quotes from AIG for D&O tail coverage of varying terms (for three or six years) and coverage limits ($5 million to $15 million). (Appellants' App. 2, 329, 317-25).  AIG's quote for a premium to purchase a six-year tail at the existing level of $15 million in coverage was $295,005.  (*Id.* at 146-47).

On April 3, 2014, Craig Martin, GlassHouse's counsel, spoke with Doug Gooding and Steve Tonkovich, Wellington's counsel.  (Appellants' App. 2, 142-43).  After the call, Martin told Wakely that comments by Gooding and Tonkovich led him to "have continuing concern that Wellington has plans to sue the board[.]"  (*Id.* at 142).  Martin understood from the conversation

---

[1] Those sales potentially implicated the "change in control" provision of the D&O policy and could result in the policy period being placed immediately into "runoff," such that there would be no coverage for conduct that post-dated the change in control.  The application of the "change in control" provision was potentially ambiguous as to whether it applied to sales of assets to multiple parties, rather than to a single buyer.

that if the board did not cooperate with Wellington's demands to satisfy its liens, "litigation would likely ensue." (*Id.*).[2]

As set forth below, the parties dispute whether anyone at GlassHouse informed anyone at Marsh about the content of the April 3 call with Wellington's counsel. There is no written evidence that GlassHouse did so. Wakely testified in a deposition in September 2020 that he "believe[d]" that GlassHouse had communicated to Marsh its concern about a suit by Wellington against the directors and officers of GlassHouse. (Sept. Wakely Dep. 79-80). Even so, he could not "remember specifically" when GlassHouse had communicated that information. (*Id.*). However, in a deposition a month later, Wakely testified that he could not remember if "[he] did or if [he] didn't" bring GlassHouse's concerns about the April 3 call to Marsh before the tail coverage was purchased on April 11. (Oct. Wakely Dep. 209-11). He further testified that he could not recall seeing any communications from anyone else employed by GlassHouse to Marsh about the call. (*Id.*).

GlassHouse did not file a "notice of circumstances" with AIG after the April 3 call. There is no evidence that Marsh advised it to do so, or had any internal discussions about it.

On April 5, 2014, Wakely e-mailed Stephen Sharp, the CEO of GlassHouse. (Appellants' App. 2, 146). Wakely told Sharp about Martin's concern that Wellington would sue

---

[2] Martin wrote to Wakely, in part:

I asked for Wellington to consider a release of the Company/Board from Wellington so that the board would know that it was not going to get sued by Wellington. [Wellington's counsel] did not seem open to this and essentially said why should they agree to this, leading [us] to have continuing concern that Wellington has plans to sue the board? [He] even said that if the board wanted to not cooperate, then litigation would likely ensue and use[d] some dramatic rhetoric. So on one hand Wellington is demanding cooperation but continuing to hedge its options to sue the board.

(Appellants' App. 2, 142).

the board.  (*Id.*).  Wakely also told Sharp about AIG's quote of $295,000 for the purchase of tail coverage at a level of $15 million in coverage.  (*Id.*).[3]

On April 6, 2014, Sharp wrote to GlassHouse's board of directors, telling them that Wellington had rejected GlassHouse's proposed release of claims.  (Appellants' App. 2, 151).  He told the board that Wellington's behavior "make[s] me think that Wellington may be considering some kind of litigation against [GlassHouse]."  (*Id.*).  Sharp also stated that GlassHouse could not "afford to pay" the proposed $295,005 premium, and that Wellington would not "sanction this expense."  (*Id.*).  Again, there is no evidence that Marsh was advised of those communications.

By April 2014, most of GlassHouse's assets had been sold.  (Appellants' App. 2, 351).

On April 14, 2014, Chiplock at GlassHouse sent an e-mail to Petri at Marsh directing her to bind tail coverage worth $5 million for three years for the directors and officers of GlassHouse.  (Appellants' App. 2, 356).  His e-mail does not mention the threat of litigation by Wellington.  In response, Petri bound the requested tail coverage.  (*Id.*).

The policy endorsement governing the tail coverage was sent to GlassHouse by May 1, 2014. (Appellants' App. 3, 194-99).  It provided that the tail policy was effective as of April 11, 2014, and explained that it gave GlassHouse three years to give notice of any claims arising from acts occurring "on or prior to" that date.  (*Id.* at 196).  On the following page, it stated that the maximum D&O coverage afforded by the tail policy was $5 million.  (*Id.* at 197).

---

[3] Wakely wrote in part:

DLA is very concerned that Wellington may be seriously considering an option to go after the directors and officers for damages.  I don't want to be an alarmist but they are getting very strange vibes from [Wellington's attorneys] and want us to be prepared.  Easier if we can discuss live later.

(Appellants' App. at 146).

Petri acknowledges that she did not specifically advise GlassHouse in writing that by binding the tail coverage, it would decrease coverage under the policy for claims made after April 11, 2014, from $15 million to $5 million.  (Petri Dep. 135-36); Sept. Wakely Dep. 123-25).

On May 9, 2014, Wellington sent a letter to certain current and former directors and officers of GlassHouse objecting to payments made to GlassHouse management and reserving Wellington's right to pursue claims against members of the GlassHouse board and management. (Appellants' App. 2, 395).

On May 14, 2014, Wakely transmitted Wellington's May 9 letter to Marsh, saying that "I think that this [letter] may be benign but wanted to give you notice."  (Appellants' App. 2, 392). Marsh notified AIG of the letter on the same day.  (Appellants' App. 2, 397-98).

On May 19, 2014, David Olsky, Wellington's outside counsel, wrote to four former GlassHouse executives and board members demanding damages for negligent misrepresentation arising out of the failure to disclose the UK liabilities to Wellington.  The letter notified them that Wellington intended to file suit against them by June 1, 2014.  (Appellants' App. 3, 286-87). Wakely forwarded that letter to Donaher at Marsh the next day.  (*Id.* at 284).  Marsh informed Wakely that the $5 million D&O limit would apply to Wellington's claims because notice had been provided after April 11, 2014, the effective date of the tail coverage.  (Sept. Wakely Dep. 86-88; Petri Dep. 160-61; Appellants' App. 3, 288).

On May 28, 2014, Wellington filed suit against the same four directors and officers, alleging negligent misrepresentation.  (Appellants' App. 1, 159-71).

On June 16, 2014, GlassHouse filed a Chapter 7 bankruptcy petition in the District of Massachusetts.  (Appellants' App. 1, 5).  That matter is still pending.

On July 8, 2014, AIG sent Wakely a reservation of rights letter with respect to Wellington's claims.  (Appellants' App. 2, 400-04).

On December 9, 2014, the trustee brought an adversary proceeding against Wellington to stay its suit against the officers and directors.  (Appellants' App. 5, 56-67).

On July 31, 2015, the bankruptcy court approved a settlement agreement between the trustee and Wellington.  (Appellants' App. 2, 406).  In the agreement, the trustee assigned Wellington the claims of the GlassHouse Estate against the current or former directors and officers of GlassHouse, and against AIG and Marsh.  (*Id.* at 407-18).

On August 7, 2015, Wellington and the trustee filed a complaint against AIG, contending that GlassHouse owed no debt to AIG and that AIG had wrongfully attempted to reduce its liability limits under the policy.  (Appellants' App. 5, 87-115).

On March 10, 2016, the trustee and Wellington entered into a settlement with AIG and the current and former directors and officers of GlassHouse.  (Appellants' App. 2, 421-35).  Under the settlement, AIG paid the trustee and Wellington $6 million and the parties exchanged mutual releases.  (*Id.*).  Wellington dismissed its claims against the directors and officers.  (*Id.*).  Wellington and the trustee dismissed their claims against AIG.  (*Id.*).  Wellington and the trustee did not receive an assignment of rights from the settling directors and officers.  (*Id.*).  The directors and officers and AIG received releases from Wellington and the Estate.  (*Id.*).

On May 30, 2017, the trustee and Wellington filed a complaint against Marsh in the bankruptcy court.  (Appellants' App. 1, 1-22).  The complaint stated claims against Marsh on behalf of both plaintiffs for breach of contract and negligence.  (*Id.* at 18-20).

On June 30, 2017, Marsh moved to dismiss all claims for failure to state a claim. (Appellants' App. 1, 174-212).

On May 31, 2019, the bankruptcy court granted the motion to dismiss with respect to Wellington's negligence claim against Marsh.  (Appellants' App. 1, 239-302).  The bankruptcy court denied the motion with respect to the trustee's claims for breach of contract and negligence.  (*Id.*).

On December 21, 2020, Marsh moved for summary judgment on the remaining claims (breach of contract on behalf of the trustee and Wellington, and negligence on behalf of the Estate).  *See In re GlassHouse Techs., Inc.*, 2022 WL 4828087 (Bankr. D. Mass. Sept. 30, 2022) ("Bankr. Summ. J. Op.").

On September 30, 2022, the bankruptcy court granted Marsh's motion for summary judgment on the remaining claims.  (*Id.*).

The trustee and Wellington have now appealed the bankruptcy court's decisions to this court.  *See* 28 U.S.C. § 158(a)(1).  They contend that the bankruptcy judge erred in granting (1) the motion for summary judgment and (2) the motion to dismiss with respect to Wellington's negligence claim against Marsh.

## II.     **The Bankruptcy Court's Summary Judgment Rulings**

### A.      **Standard of Review**

A district court "review[s] legal determinations [of a bankruptcy court] *de novo*."  *In re Gonic Realty Tr.*, 909 F.2d 624, 626 (1st Cir. 1990).  A bankruptcy court's decision to grant summary judgment as a matter of law is therefore reviewed *de novo*.  *In re Spookyworld, Inc.*, 346 F.3d 1, 6 (1st Cir. 2003).

Rule 56 applies in bankruptcy proceedings.  FED. R. BANKR. P. 7056.  The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall

14

be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but must "present affirmative evidence." *Id.* at 256-57.

### B.   <u>Summary Judgment – Breach of Contract</u>

The bankruptcy court found that there was a genuine dispute of material fact as to whether Marsh breached the engagement agreement. Bankr. Summ. J. Op. at 22-25. Specifically, the court found that genuine disputes of material fact existed as to "whether Marsh properly advised GlassHouse regarding the necessity and advantages or disadvantages of obtaining the Tail," and whether GlassHouse's instructions to Marsh to bind the tail coverage were "appropriately informed and understood." *Id.* at 23.

However, the bankruptcy court found that there was no genuine dispute of material fact that GlassHouse's failure to inform Marsh of the April 3, 2014 telephone call—that is, the call between counsel for GlassHouse and Wellington that led counsel to believe Wellington intended to sue the board—was a material breach of the engagement letter, excusing Marsh from further performance. *Id.* at 25-41.

Appellants contend that the bankruptcy court erred in its finding of a material breach by GlassHouse.[4]  They contend (1) that GlassHouse had informed Marsh for months of a situation that entailed heightened risk of a suit against the GlassHouse's directors and officers and (2) that Chiplock and Wakely specifically informed Marsh about the April 3, 2014 telephone call.  They further contend that the bankruptcy court inappropriately relied on Petri's testimony to conclude that GlassHouse's breach of the engagement letter was material.

### 1.   **Legal Standard**

The essential elements of a breach-of-contract claim under New York law are "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (N.Y. App. Div. 2013).[5]

A party materially breaches a contract when its breach is so substantial that it defeats the object of the parties in making the contract.  *Robert Cohn Assocs. v. Kosich*, 881 N.Y.S.2d 235, 237 (N.Y. App. Div. 2009).  A material breach by one party will excuse the other's obligation to perform.  *Id.*; *see also* 23 WILLISTON ON CONTRACTS § 64:3 (4th ed. 2023) ("A party who first commits a material breach cannot enforce the contract.").  The materially breaching party "is not entitled to recover damages for the other party's subsequent nonperformance of the contract." 23 WILLISTON ON CONTRACTS § 63:3.

---

[4] The trustee, as successor to the debtor's interest, may raise causes of action that could have been asserted by the debtor.  *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989). Defendant may raise the same defenses against those claims as it would against the debtor.  *Id.*

[5] The bankruptcy court determined that New York law should apply to plaintiffs' breach-of-contract claim. *In re GlassHouse Technologies, Inc.*, 604 B.R. 600, 607 (Bankr. D. Mass. 2019).  The parties do not dispute that determination on appeal.

In determining whether a breach is material, courts consider several factors provided by the Restatement (Second) of Contracts.  *E.g.*, *Wechsler v. Hunt Health Sys.*, 33 F. Supp. 2d 383 (S.D.N.Y. 2004).  Those factors include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

RESTATEMENT (SECOND) OF CONTRACTS, § 241.  Courts also consider "the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness [of the breach], and the degree to which the injured party has benefitted under the contract."  *Process Am., Inc. v. Cynergy Holdings*, 839 F.3d 125, 136 (2d Cir. 2016).

### 2.    Analysis

As noted, the engagement agreement provided that GlassHouse was "solely responsible for the accuracy and completeness of all information that [GlassHouse] furnish[ed] to Marsh"; that "Marsh shall not be responsible to verify the accuracy or completeness of any information that [GlassHouse] provide[d]"; that "Marsh shall be entitled to rely on that information"; that "Marsh shall have no liability for any errors, deficiencies or omissions in any [s]ervices provided to [GlassHouse], including the placement of insurance on [GlassHouse's] behalf, that are based on inaccurate or incomplete information provided to Marsh"; and that "[GlassHouse] understand[s] that the failure to provide all necessary information to an insurer, whether

intentional or by error, could result in the impairment or voiding of coverage." (Appellants'
App. 1, 25).

### a.  <u>Marsh's Knowledge of Possible Wellington Action</u>

Marsh contends that GlassHouse breached the engagement letter because it did not
inform it that Wellington was likely to file suit against the directors and officers of GlassHouse.
Appellants contend that Marsh was fully informed, or reasonably should have known, that
Wellington was likely to sue.

First, appellants contend that GlassHouse did not breach the engagement letter because it
did, in fact, inform Marsh about the April 3, 2014 telephone call.  As the bankruptcy court noted,
the evidence is not sufficient to support a finding that it did so.  Bankr. Summ. J. Op. at 28-30.
Again, Wakely initially testified that he "believe[d]" that GlassHouse had communicated to
Marsh its concern about a suit by Wellington against the directors and officers of GlassHouse.
(Sept. Wakely Dep. 79-80).  Even so, he could not "remember specifically" when GlassHouse
had communicated that information.  (*Id.*).  In a deposition a month later, Wakely testified that
he could not remember if "[he] did or if [he] didn't" bring GlassHouse's concerns about the
April 3 call to Marsh before the tail coverage was purchased.  (Oct. Wakely Dep. 209-11).

That testimony, without more, is not enough to show that GlassHouse did, in fact, inform
Marsh. *See Cahoon v. Shelton*, 647 F.3d 18, 27 n.6 (1st Cir. 2011) ("A party who bears the
burden of proof on an issue cannot defeat summary judgment by relying on speculation about the
facts.").  Accordingly, there is insufficient evidence that Wakely, Chiplock, or any other
GlassHouse employee actually informed anyone at Marsh about the April 3 call, or timely
provided any other information about their concerns that Wellington was threatening to file suit.

Second, appellants contend that there is ample evidence that Marsh and AIG knew or
should have known that there was a heightened risk that Wellington would file a claim covered

by the D&O policy.  They point to several pieces of evidence showing Marsh's awareness of GlassHouse's financial condition that (they contend) show that it should have known for months that Wellington might assert claims against the directors and officers.

Donaher's March 3, 2014 e-mail reflects that Marsh knew that GlassHouse owed £616,000 to HMRC, and that GlassHouse's "executive team [was] worried this sum might follow officers' personal assets."  (Appellants' App. 3, 272).  But that e-mail indicates only a concern that the UK tax authorities might look to the personal assets of the corporate officers for failure to remit taxes (as they might in the United States).  The e-mail does not mention Wellington, any claims that Wellington might bring, or any possibility that Wellington (rather than HMRC) would look to the personal assets of the officers to make up any losses.  (*See id.*).

Appellants next cite Petri's notes from the March 28, 2014 call.  According to appellants, those notes show that Marsh knew that "creditor liabilities . . . would likely exceed the limits of liability on the policy."  (Appellants' Br. at 38).  The notes do not actually say that.  More importantly, they do not mention a possible claim by Wellington against the directors and officers at all.  (*See* Appellants' App. 3, 174).  There is no discussion of the D&O policy specifically, or the possible liability of the directors and officers.  (*Id.*).

Appellants contend that the only reason that Marsh and AIG could have been concerned about Wellington's ability to recover the amounts owed to it was because of a heightened risk that Wellington would file a claim covered by the D&O policy.  Appellants cite no sources in support of that argument.  While Petri's notes refer to a "creditor water fall," that is simply a reference to a repayment scheme in which higher-level creditors receive payments first.  It certainly does not suggest that Marsh was told, or should have known, that Wellington was actually threatening to file suit against the directors and officers.

Certainly, it seems possible that the general business conditions that GlassHouse faced could have alerted an insurance broker to the possibility of claims by a creditor against the directors and officers.  Steve Maggiacomo, AIG's designee, testified that "in a distressed financial situation[,] the likelihood that you will see a claim from a creditor is higher." (Maggiacomo Dep. 64).  But he could not "laser out which of [GlassHouse's] creditors or which of their equity holders [would] be the one to bring the suit."  (*Id.*).  And awareness of the general *possibility* of a creditor suit is different than knowledge of a *likely* suit by a specific creditor against the directors and officers of a debtor based on a specific claim of misrepresentation.[6] There certainly was no evidence of any discussion concerning wrongdoing by the directors or officers.  Wellington's suit against the directors and officers arose out of allegedly false or negligent misrepresentations about GlassHouse's tax liabilities; those representations were not discussed in the March 28, 2014 telephone call.  (*See* Appellants' App. 3, 133-34).[7] Accordingly, the content of that call does not demonstrate that Marsh knew or should have known that Wellington was *likely* to sue GlassHouse's directors and officers for misrepresentation.

Appellants next cite an April 8, 2014 e-mail from Petri to Chiplock.  In that e-mail, Petri discussed the consequences of failing to bind tail coverage on that day.  (*See* Appellants' App. 3, 207-08).  She asserted that, without binding the tail coverage, "the policy will continue in full force for Wrongful Acts that occur prior to the [sale of GlassHouse's assets] but there is no

---

[6] As an example:  A buyer of a used car knows that there is elevated risk of prior damage or malfunctioning parts compared to purchasing a new car.  But he will not anticipate that any specific part of the car was giving trouble and is likely to malfunction, unless the seller so informs him.  And certainly, if a seller informs a buyer that the car's transmission is faulty during negotiation, that will materially change their negotiation over purchase terms.

[7] According to appellants' complaint, "*[b]y April 6, 2014*, GlassHouse understood that it was likely to be sued by Wellington."  (Compl. ¶ 56, Appellants' App. 1, 10 (emphasis added)).

coverage for alleged wrongful acts occurring after the effective time" of GlassHouse's sale of substantially all of its assets.  (*Id.*).  Appellants contend that if Petri did not already know that GlassHouse needed $15 million in coverage for wrongful acts by the directors and officers before April 11, 2014, she would not have provided those assurances to Chiplock.  (Appellants' Br. at 39).  That argument misreads the e-mail.  Instead, Petri explained that, without the bound tail coverage, the original policy would not provide coverage after GlassHouse's asset sales.  The effect of the binder would be to extend GlassHouse's elected coverage beyond the sale of substantially all of its assets—it is not an assurance that their original coverage would remain if GlassHouse followed Marsh's advice.

Appellants assert that "[i]t certainly makes no sense that individual D&Os would refrain from immediately sending a claim to Marsh and put their personal assets at risk to Wellington or a future bankruptcy trustee."  (Appellants' Br. at 43).  That may be, but whatever their motivations, there is no evidence that Chiplock, Wakely, Sharp, any of the directors and officers, or GlassHouse's counsel ever informed Marsh about the April 3, 2014 call or their counsels' concern that Wellington planned to sue the board.

In sum, the evidence does not demonstrate that GlassHouse informed Marsh before the placement of tail coverage about the substantial risk that Wellington would sue its directors and officers.

### b.      **Materiality of GlassHouse's Breach**

The bankruptcy court concluded that GlassHouse's failure to inform Marsh about Wellington's threatened claims, the risk that those claims would be against the directors and

officers, and its need to maintain $15 million in coverage for acts before April 11, 2014, were all actions that materially breached the engagement letter.[8]

The Court agrees with the bankruptcy court's characterization of those omissions by GlassHouse. The engagement letter makes clear that GlassHouse was required to share complete and accurate information about its financial situation with Marsh as a condition of obtaining its services. Appellants do not dispute that if that characterization is correct, it breached the engagement letter.

Appellants instead contend that the bankruptcy court erred by finding that GlassHouse's breach of the engagement letter was material. The bankruptcy court found that it was material because Marsh's advice and actions would have been different had GlassHouse provided accurate information. The court cited Petri's deposition testimony that if GlassHouse had told Marsh about Wellington's threatened claim, "we probably all wouldn't be here today . . . that would have been likely notice to the policy, and therefore the course of action would have been different in terms of next steps from there." (Appellee App. 15-16; Bankr. Summ. J. Op. at 38). Petri testified that had GlassHouse told Marsh that it expected to be sued by Wellington, Marsh could not have placed the tail coverage with AIG. (Appellee App. 16).

As the bankruptcy court noted, Petri's testimony was undisputed. Appellants address that testimony once in their brief, and simply argued that her testimony was "self-serving." (Appellants' Br. at 43). It seems beyond dispute that if GlassHouse had in fact provided full

---

[8] Again, the engagement agreement provides that GlassHouse is "solely responsible for the accuracy and completeness of all information that [GlassHouse] furnish[es] to Marsh"; that "Marsh shall not be responsible to verify the accuracy or completeness of any information that [GlassHouse] provide[s]"; that "Marsh shall be entitled to rely on that information"; that "Marsh shall have no liability for any errors, deficiencies or omissions in any Services provided to [GlassHouse], including the placement of insurance on [GlassHouse's] behalf, that are based on inaccurate or incomplete information provided to Marsh"; and that "[GlassHouse] understand[s] that the failure to provide all necessary information to an insurer, whether intentional or by error, could result in the impairment or voiding of coverage." (Appellants' App. 1, 23).

information to Marsh, it would have impacted the purchase of tail coverage.  Maggiacomo

testified that "it would not be in [GlassHouse's] best interest" to share information about

Wellington's impending lawsuit with AIG, and that, had it done so, "it may well have had [an]

impact on our issuance."  (Appellants' App. 4, 141, 143).  Common sense suggests that an

insurance broker would have acted differently had the client revealed that it faced a specific

threat of a lawsuit against its directors and officers rather than an abstract possibility.

GlassHouse's breach, among other things, substantially undermined Marsh's ability to accurately

gauge its client's insurance needs and to render accurate advice.  It is striking that not one of

GlassHouse's written communications to Marsh after April 3, 2014, mentioned, or even

suggested, that Wellington planned to sue the board.

Appellants appear to contend that the bankruptcy court erred by discounting the alleged

breaches of the contract by Marsh itself.[9]  To the extent that the argument is directed at the

materiality of GlassHouse's breach, it is not relevant.  It is hornbook law that a party that

materially breaches is "not entitled to recover damages for the other party's subsequent

nonperformance of the contract."  23 WILLISTON ON CONTRACTS § 63:3.  The degree of the other

party's subsequent nonperformance is not a factor considered in whether the initial breach was

material.  As the bankruptcy court recognized, there is a genuine dispute of material fact as to

whether Marsh breached the agreement by not informing GlassHouse of the consequences of

binding the tail.  And appellants further assert that Marsh breached the contract by not advising

GlassHouse to file a "notice of circumstances" before binding the tail.  But even if those alleged

---

[9] *See* Appellants' Br. at 38 ("Yet Marsh did nothing to preserve the $15 million limit of liability."); *id.* at 39
("The Bankruptcy Court also ignored that [Petri's April 8, 2014 advice to Chiplock] was simply wrong."); *id.* at 41
("The Bankruptcy Court's only reference to Marsh's failure to advise on or file a notice of circumstances is found in
a single footnote.")).

breaches occurred, they were after GlassHouse's earlier material breach.  That earlier breach meant that Marsh was not timely informed of the facts that would have led to the filing of a "notice of circumstances."  Marsh is therefore not liable for breach of contract as to those acts.[10]

In sum, the Court finds that GlassHouse materially breached its contract with Marsh.  The bankruptcy court was therefore correct to enter summary judgment in favor of Marsh as to the breach-of-contract claim.

### C.    Summary Judgment – Negligence (Trustee)

Appellants further contend that Marsh was negligent because it (1) failed to advise GlassHouse to file a "notice of circumstances" before binding the tail coverage, (2) failed to advise GlassHouse that the proposed tail coverage would reduce D&O coverage by $10 million for acts and omissions occurring before April 11, 2014, and (3) procured the tail coverage for GlassHouse, resulting in a reduction in coverage, without proper disclosure to or authority from GlassHouse.

The bankruptcy court found that Marsh was not liable to the trustee for negligence.  First, it found that GlassHouse did not provide sufficient notice to Marsh about the circumstances of GlassHouse UK such that Marsh had a duty to advise GlassHouse to file a notice of circumstances.  Bankr. Summ. J. Op. at 57-58.  Second, it found that GlassHouse's negligence exceeded any negligence of Marsh, because GlassHouse failed to inform Marsh about Wellington's likely claims.  *Id.* at 61.  Third, it found that GlassHouse failed to read the provisions of the tail coverage and advise Marsh of apparent discrepancies between those

---

[10] The bankruptcy court further found that Marsh was not liable for breach of contract because of a disclaimer in the engagement agreement.  That provision provides that "Marsh shall have no liability for any errors, deficiencies or omissions in any Services provided to you, including the placement of insurance on your behalf, that are based on inaccurate or incomplete information provided to Marsh."  (Appellants' App. 1, 25).  Because the Court finds that GlassHouse's material breach of the engagement letter excused any inadequacies in Marsh's performance, it will not address that issue.

provisions and its expectations, severing any causal connection between negligence by Marsh and the resulting harm.  *Id.* at 64-65.

## 1.      **Legal Standard**

"[A]n insurance agent or broker who, with a view to compensation for his services, undertakes to procure insurance for another, and through his fault and neglect fails to do so, will be held liable for any damage resulting therefrom."  *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 192 (1982) (citation omitted).[11]  A plaintiff may bring a claim in negligence against such a broker. *Id.* at 193.  The elements of negligence are the existence of a duty, breach of that duty, causation, and damages.

"There is no general duty of an insurance agent to ensure that the insurance policies procured by him provide coverage that is adequate for the needs of the insured."  *Martinonis v. Utica Nat'l Ins. Grp.*, 65 Mass. App. Ct. 418, 420 (2006).  "Nevertheless, in an action against the agent for negligence, the insured may show that special circumstances prevailed that gave rise to a duty on the part of the agent to ensure that adequate insurance was obtained."  *Id.*  Special circumstances may include an insurance agent's "long relationship" with the insured, "the reliance [the insured] placed on [the agent's] review of the adequacy of their insurance," the agent's "specific assurance on past occasions in response to inquiries that the policies had adequate limits of liability," and "the specific assurance in the case at bar that the limits were proper."  *Id.*; *see also McCue v. Prudential Ins. Co. of Am.*, 371 Mass. 659, 661-62 (1976) ("A jury could have found that there was a climate in which reliance by the plaintiffs on [the agent's] assertions and representations [about the policy] was particularly justified.").  "A plaintiff must

---

[11] The bankruptcy court found that Massachusetts law applies to the negligence claims.  *In re GlassHouse Technologies, Inc.*, 604 B.R. at 619.  The parties do not dispute that finding.

be able to show a specific assertion and subsequent reliance to establish special circumstances." *AGA Fishing Grp. v. Brown & Brown, Inc.*, 533 F.3d 20, 24 (1st Cir. 2008).

The relative simplicity of a policy is one factor that a court may consider in determining whether an insured was reasonable in relying on an agent's representations. *Sarnafil, Inc. v. Peerless Ins.*, 418 Mass. 295, 306-07 (1994) ("The coverage provisions in the [insurer's] policies are only two or three pages long, and loss prevention coverage is distinctly absent; in such circumstances, a business entity such as [the insured] should read its policies rather than rely on representations by an agent."). "Although an insured is entitled to rely on his broker as his agent, an insured cannot abandon all responsibility for ascertaining the terms of the coverage his broker obtained." *Campione v. Wilson*, 422 Mass. 185, 196 (1996). "[A]ll the circumstances of the transaction, such as the nature of the relationship between broker and the insured, the reasonableness of the parties' conduct, and the insured's sophistication and experience" are relevant to this determination. *Id.*

## 2.   <u>Analysis</u>

As noted, GlassHouse failed to inform Marsh in a timely manner of its concerns that Wellington was likely to bring suit against the directors and officers. Without that knowledge, Marsh only had a general understanding of GlassHouse's accounting and wind-up issues. Therefore, to the extent that the negligence claim is based on Marsh's failure to advise GlassHouse to file a "notice of circumstances" with AIG, based on "circumstances which may reasonably be expected to give rise to a Claim being made against the insureds," (Appellants' App. 1, 23), Marsh did not breach its duty.

Appellants further contend that Marsh was negligent for failing to advise GlassHouse that the proposed tail coverage would reduce the D&O coverage by $10 million, and then procuring coverage that reduced the amount without proper disclosure to or authority from GlassHouse.

26

As noted, an insurance agent does not have a general duty to ensure that the policies it procures provide coverage adequate for the needs of the insured.  *Martinonis*, 65 Mass. App. Ct. at 420.  Appellants must therefore show that "special circumstances" existed to establish that Marsh had a duty to ensure that the policy provided adequate coverage.

Appellants have not shown that such special circumstances existed.  Neither GlassHouse nor any of its representatives told Marsh that preservation of the $15 million liability limit for claims made before April 11, 2014, should have taken priority in extending coverage for several years.  Appellants assert that "it should hardly be an obligation for GlassHouse to reinforce what was already obvious, particularly in light of the [March 28, 2014, disclosures about GlassHouse's financial situation]."  (Appellants' Br. at 49).  But the evidence does not support that argument.  The record shows that GlassHouse discussed extending its insurance coverage with Marsh—but there is no evidence that it expressed the view that maintaining the $15 million coverage was critical in light of the potentially wrongful acts by its directors and officers.  Indeed, GlassHouse itself requested $5 million coverage after receiving premium quotes for the higher amount.  Under the circumstances presented to Marsh, it is reasonable to infer that Marsh understood that GlassHouse's goal was to extend the coverage period, rather than to preserve the higher limit of that coverage.

Furthermore, Marsh sent the endorsement to GlassHouse on May 1, 2014, that clearly described the change to the existing policy.  (*See* Appellants' App. 3, 195-98).  The endorsement cover page explains that the tail "[a]mends the policy to provide a period of three (3) years in which to give written notice to [AIG] of any claim(s) first made against [GlassHouse] during the [three-year period] for any Wrongful Act(s) occurring *on or prior to April 11, 2014.*"  (*Id.* at 195 (emphasis added)).  The endorsement also provides that "[s]olely with respect to the D&O

Coverage Section the maximum limit of the Insurer's liability for all Loss arising from coverage as is afforded by this endorsement shall be $5,000,000." (*Id.* at 197). Those two clauses, read in tandem, make clear that the tail provided GlassHouse's D&O coverage for wrongful acts occurring before April 11, 2014, would be $5 million. The endorsement is four pages long, separates distinct provisions, and is written in reasonably plain and comprehensible language. The cover page, moreover, specifically directed GlassHouse to "advise [Marsh] at [its] earliest opportunity of anything which [it] believe[d] is not in accordance with the negotiated coverage and terms." (*Id.* at 195). After receiving that document, no one at GlassHouse contacted Marsh to dispute that the endorsement accurately reflected their requested coverage.

Appellants further contend that special circumstances existed because of two communications between Marsh and GlassHouse. First, they contend that Petri's April 8, 2014 e-mail "reassured Chiplock and Wakely about the continuing existence of the $15 million limit of liability for pre-purchase conduct." (Appellants' Br. at 47-48). As discussed, however, Petri's e-mail does not provide that assurance. Instead, it states that "the tail will need to bound today" in order to "grant affirmative coverage for the winding down activities and any activities [after the sale of GlassHouse's assets]." (Appellants' App. 3, 200). It states the tail would "include coverage for all winding down activities for [three years]" and that the cost would be $166,250 for a "$5M limit, 3 year tail." The e-mail relayed accurate statements about the tail and did not promise that the $15 million liability limit would remain.

Second, appellants cite "the summary provided on May 14, 2014 to Wakely showing a $15 million limit of liability for the claims by Wellington." (Appellants' Br. at 48). That document is Marsh's May 14, 2014 "notice of circumstances" to AIG's claims department. (*See* Appellants' App. 3, 282). Wakely was copied on that e-mail and was not its direct recipient.

Marsh's notice came well after Marsh and GlassHouse had discussed binding the tail.  (*Cf.* Appellants' Br. at 49 ("By [May 1, 2014], the damage had already been done.")).  An e-mail after the purchase of the insurance policy, not directed to the purchaser of the policy, provides little support, if any, for a claim of reliance.

Accordingly, appellants have not shown that Marsh owed a duty to GlassHouse to preserve its $15 million liability limit.  GlassHouse did not inform Marsh about its desire to preserve that level of coverage, and Marsh's communications with GlassHouse did not reassure GlassHouse that the tail would preserve it.[12]

## III.    The Motion to Dismiss

### A.    Standard of Review

Rule 12(b) applies in bankruptcy proceedings.  FED. R. BANKR. P. 7012(b).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5

---

[12] Marsh contends that the trustee's negligence claim is also barred by the engagement letter's disclaimer of liability for services based on inaccurate or incomplete information; by GlassHouse's greater comparative negligence; and because the trustee has no cognizable damages.  Because the Court finds that GlassHouse has failed to show that Marsh had a duty to advise it about the reduction in the amount of the coverage limit, the Court will not address those arguments.

(1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

    **B.**    **Wellington's Negligence Claim**

    Appellants contend that the bankruptcy court erred when it dismissed Wellington's negligence claim for failure to state a claim.

    **1.**    **Legal Standard**

    Under Massachusetts law, a party is generally not liable to a third party for its negligence in providing contractual services to another.  *See Page v. Frazier*, 388 Mass. 55, 64 (1983).  An exception exists for instances "where the defendant knew that the plaintiff would rely on his services [to the contracting party]," and it was foreseeable that the defendant's conduct will harm the plaintiff.  *Rae*, 386 Mass. at 193.  "[A] defendant must have actual knowledge of a plaintiff's reliance in order to state a claim against it."  *Nycal Corp. v. KPMG Peat Marwick*, 426 Mass. 491, 495 (1998).

    Some factors may create a "rightful and foreseeable" expectation that a plaintiff will rely on a defendant properly performing its contractual duties.  *Flattery v. Gregory*, 397 Mass. 143, 147 (1986).  Where a statute mandates that a defendant obtain insurance for a third party, it is reasonable for a plaintiff to rely on the defendant's performance.  *E.g.*, *Rae*, 386 Mass. at 193.

2.      **Analysis**

Appellants contend the complaint states a third-party claim for negligence because Marsh became aware on March 28, 2014, that Wellington would rely on its services to GlassHouse.[13] Specifically, appellants contend that the March 28, 2014 meeting with AIG and GlassHouse made Marsh aware that Wellington was GlassHouse's senior creditor and that GlassHouse had defaulted on its loan to Wellington.  Appellants contend that "the Policy was the only major asset left to GlassHouse, and certainly Marsh should have understood . . . that its services were being used to preserve that asset for the benefit of the secured creditor, among others."  (Appellants' Br. at 52).

None of those allegations were pleaded in the complaint.  Part 3 of the complaint begins by describing events at the beginning of March 2014.  (*See* Compl. ¶¶ 48-50, Appellants' App. 1, 9).  The complaint alleges that GlassHouse notified Marsh about HMRC's wind-up against GlassHouse UK; that GlassHouse "also notified Marsh that Wellington had initiated secured party sales of its assets;" and that Marsh advised GlassHouse to purchase tail coverage. (*Id.* ¶¶ 51, 52, 62).[14]  There is no mention of the March 28, 2014 meeting and the complaint does not plead facts sufficient to show that Marsh had actual knowledge of Wellington's reliance.

Even considering the evidentiary record presented at summary judgment, the complaint would still fail to state a claim.  As discussed, Marsh did not know that Wellington was likely to bring a claim against the directors and officers.  There is no evidence that Marsh would have understood the importance of preserving the $15 million liability limit, and it would not have

---

[13] Appellants' brief contains no citations to the complaint in support of this argument.  (*See* Appellants' Br. at 51-52).

[14] Paragraph 52 of the complaint cites Exhibit 4 for that proposition.  Exhibit 4 is an April 11, 2014 e-mail between Marsh employees describing how a GlassHouse employee had "confirmed majority of GlassHouse now owned by Wellington in phased sell off."  (Appellants' App. 1, 37).

been foreseeable to Marsh that Wellington would later bring a claim against the directors and officers in excess of the $5 million tail coverage.

Accordingly, the negligence claim against appellee on behalf of Wellington fails to state a claim upon which relief can be granted.

**IV.**   **Conclusion**

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  September 21, 2023                Chief Judge, United States District Court